UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

<u>In re</u>

COLONY BEACH & TENNIS CLUB
ASSOCIATION, INC.,

_____/

COLONY BEACH & TENNIS CLUB, Ltd.,
RESORTS MANAGEMENT, INC., and
COLONY BEACH & TENNIS CLUB, INC.,

     Appellants,

v.                            CASE NO.: 8:09-cv-2560-T-23

COLONY BEACH & TENNIS CLUB
ASSOCIATION, INC.,

     Appellee.

_____/

## <u>ORDER</u>

Colony Beach & Tennis Club, Ltd., ("the Partnership") appeals (Doc. 16) a

November 9, 2009, bankruptcy court judgment and order. (Docs. 1-4, 1-5) The Colony

Beach & Tennis Club Association, Inc., ("the Association") responds, (Doc. 21) and the

Partnership replies. (Doc. 24) The dominant issue on appeal is whether the documents

governing the Colony Beach & Tennis Club ("the Colony") require the Association

(through assessment of the Association's members) or the Partnership (through the

revenue of the Colony Beach & Tennis Club's resort hotel ("the hotel")) to pay for

repairs to the common elements of the Colony.

BACKGROUND

In 1973, Dr. Murray Klauber founded the Colony, a condominium complex and resort hotel in Sarasota, Florida.  Each purchaser of a condominium unit (a "unit owner") at the Colony is both a member of the Association and a limited partner in the Partnership.  Dr. Klauber is the general partner of the Partnership, the general partner controls the Partnership, and the general partner and the Partnership control and operate the hotel at the Colony.  Katherine Moulton is the general manager of the hotel.

A Declaration of Condominium ("the Declaration") governs the Colony and the Association.  The Declaration states that "[t]he maintenance and operation of the common elements [of the Colony] . . . shall be the responsibility of the Association as a common expense."  (Ex. 13 Art. 6.5)  In addition, Article 6 of the Association's By-Laws requires the Association to establish a reserve for deferred maintenance of the common elements and empowers the Association to assess each unit owner (as an Association member).  A Limited Partnership Agreement ("the Partnership Agreement") governs the Partnership.  The Partnership Agreement grants each unit owner (as a limited partner) thirty days of rent-free use of that owner's unit annually and authorizes the Partnership to operate each unit as a hotel accommodation during the balance of the year.  (Ex. 22 Art. 10)  The Partnership Agreement grants to each limited partner an aliquot portion of a "preferential amount" – the first $1.398 million – of the hotel's annual profit, plus half the profit above the preferential amount (with the other half granted to the general partner).  (Ex. 22 Art. 11)  The Partnership Agreement immunizes each limited partner

from liability for any loss from the hotel's operation.  (Ex. 22 Art. 7.5)  A 1984

Agreement, central to the parties' dispute, simplifies the exchange of money between

the Association and the Partnership.  The 1984 Agreement permits the Partnership to

commit that portion of the hotel's profit that is owed to the limited partners to pay directly

the Association's bill for repair to the common elements.  (Ex. 27 ¶ 2)

      In December, 2004, the Association's Board of Directors ("the Association Board"

or "the Board") discussed the common elements' urgent need for extensive repair.  (Sal

Zizza, the President of the Association at the time, testified that the common elements'

dilapidation was obvious long before this discussion).  See generally (Ex. 100)  The

Board hired an engineering firm to estimate the cost of repair, and the firm estimated

$10 million in repair and renovation.  The Partnership urged the Association to pay for

necessary repair, but in December, 2005, the unit owners voted to reject a $10.6 million

"emergency assessment" for repair and improvement of the common elements.  In

December, 2006, the unit owners rejected a second proposed assessment and elected

three new Board members.  The new Board audited the Partnership and ceased

re-paying the Partnership for many operational expenses that are the Association's

responsibility under the Declaration.

      In April, 2007, the Partnership sued the Association in state court.  Asserting state

law claims for the Association's breach of the governing documents, the Partnership

sought (1) damages, (2) a determination that the governing documents compel the

Association to assess the unit owners both for $2.1 million that the Partnership spent on

the Association's behalf and for the money to repair the common elements, and (3) an

injunction compelling the Association to assess the unit owners.  The Association alleged that the 1984 Agreement is <u>ultra</u> <u>vires</u> (and that the Partnership in any event breached the 1984 Agreement) and alleged both state law counter-claims against the Partnership and third-party claims against the general partner and Colony Beach & Tennis Club, Inc.  The Association sought damages and an equitable accounting of the Partnership's operation of the hotel.

Eighteen months after the Partnership initiated the state court action and shortly before the state court trial, the Association claimed bankruptcy.  The Partnership filed the state law claims in the bankruptcy proceeding but also moved for remand or for abstention on the ground that the state law claims are not a "core" proceeding within a bankruptcy court's mandatory jurisdiction.

The bankruptcy court denied remand and held a bench trial, which occurred in May and June, 2009.  At a July 31, 2009, hearing and in a November 9, 2009, order the bankruptcy court disallowed the Partnership's claims, found the 1984 Agreement <u>ultra</u> <u>vires</u>, found the Partnership's damage calculation prohibitively speculative, denied the Partnership relief, and declared "moot" the Association's other counter-claims and third-party claims.

The Partnership argues in this appeal that each claim is a "non-core" proceeding, that the bankruptcy court incorrectly interpreted the governing documents, that the Association's obligation to pay for repair of the common elements persists despite the two votes to reject an assessment, that the 1984 Agreement is valid, that the

Partnership's damage calculation is sound, and that the Association's claims are not moot.

DISCUSSION

1. Core and Non-Core Proceedings

"[B]ankruptcy courts are not Article III courts and therefore may not exercise the judicial power of the United States." In re Parklane/Atlanta Joint Venture, 927 F.2d 532, 538 (11th Cir. 1991). Consequently, a bankruptcy court may not exercise jurisdiction over "all civil proceedings . . . related to cases under [the bankruptcy code]," because although "the restructuring of debtor-creditor relations . . . is at the core of the federal bankruptcy power, the adjudication of state-created private rights, such as the right to recover contract damages . . . . obviously is not." Northern Pipeline Const. Co. v. Marathon Pipe Line Co., 458 U.S. 50, 71 (1982) (plurality opinion).[1]

"In order to avoid the constitutional problems discussed by the Supreme Court in Northern Pipeline . . , Congress created [in 28 U.S.C. § 157] the distinction between core and non-core proceedings." Control Center, LLC v. Lauer, 288 B.R. 269, 274 (M.D. Fla. 2002) (Conway, J.). A bankruptcy court may issue a final order on a core

_____

[1] See also, Northern Pipeline, 458 U.S. at 86 n.39 (plurality opinion) ("Our precedents make it clear that the constitutional requirements for the exercise of the judicial power must be met at all stages of adjudication, and not only on appeal, where the court is restricted to considerations of law, as well as the nature of the case as it has been shaped at the trial level") and at 91 (Rehnquist, J., concurring) ("[under the unconstitutional portion of the Bankruptcy Reform Act of 1978, 28 U.S.C. § 1471,] [a]ll matters of fact and law . . . are to be resolved by the bankruptcy court in the first instance, with only traditional appellate review by Art. III courts apparently contemplated. Acting in this manner the bankruptcy court is not [merely] an "adjunct" of either the district court or the court of appeals."); Commodity Futures Trading Com'n v. Schor, 478 U.S. 833, 852-53 (1986) (distinguishing proper statutory empowerment of agency tribunal to adjudicate "a particularized area of law" (a common law counter-claim by customers in a CFTC reparation proceeding against a broker) from "the jurisdiction of the bankruptcy courts found unconstitutional in Northern Pipeline[, which] extended to broadly 'all civil proceedings arising under title 11 or arising in or related to cases under title 11.'") (emphasis in original) (quoting Northern Pipeline, 458 U.S. at 85).

proceeding, which a district court reviews *de novo* as to conclusions of law and for clear error as to findings of fact.  28 U.S.C. § 157(b); Fed.R.Bankr.P. 8013.  A bankruptcy court may only propose findings of fact and conclusions of law on a non-core proceeding, with the district court entering a final order "after reviewing *de novo* those matters to which any party . . . object[s]."  28 U.S.C. § 157(c)(1); Fed.R.Bankr.P. 9033.

Ruling from the bench[2] that each Partnership claim is a core proceeding, the bankruptcy court stated, "Claims were asserted against the [Association] . . . in the state court action – claims were made against the Association by the very filing of the lawsuit . . . . and that is inherently a core matter, the adjudication of those claims."  8:08-ap-567-KRM, Doc. 14 at 83.  Elaborating on behalf of the bankruptcy court, the Association asserts that each claim qualifies as a core proceeding because Section 157 states that a core proceeding includes "allowance or disallowance of claims against the estate," "counter[-]claims by the estate against persons filing claims against the estate," and "other proceedings affecting . . . the adjustment of the debtor-creditor . . . relationship."  28 U.S.C. § 157(b)(2).

The Partnership correctly asserts that the bankruptcy court erred.  Section 157 "conform[s] the bankruptcy statutes to the dictates of [Northern Pipeline] . . , [which] was concerned about . . . the plenary adjudication by bankruptcy courts of proceedings related only peripherally to an adjudication of bankruptcy."  In re Toledo, 170 F.3d 1340,

---

[2] The bankruptcy court issued a written order that states "for the reasons stated and recorded in open court, which shall constitute the decision of the Court , . . ."  Case No: 8:08-ap-567-KRM (Doc. 12 at 2).

1349 (11th Cir. 1999) (quotations omitted).  Conforming Section 157 to <u>Northern</u>

<u>Pipeline</u>, the Eleventh Circuit concludes:

> If [a] proceeding does not invoke a substantive right created by the federal
> bankruptcy law and is one that could exist outside of bankruptcy it is not a
> core proceeding; it may be *related* to the bankruptcy because of its
> potential effect, but under section 157(c)(1) it is a . . . non-core proceeding.

170 F.3d at 1348 (emphasis in original) (quoting <u>In re Wood</u>, 825 F.2d 90, 97 (5th Cir.

1987)).  The bankruptcy court acknowledged both that the Partnership initiated the

claims in state court and that each claim "could exist outside of bankruptcy."  Further, as

in <u>Northern Pipeline</u>, each claim, including each Association counter-claim, presents a

matter – the condominium form of real estate ownership and relations among the

participants in that form of ownership – singularly and emphatically, preeminently and

pervasively, governed by Florida law.  To the governance of the condominium form of

real estate ownership and those participating, the federal bankruptcy law is an awkward

and unwelcome intruder.  Each claim is a non-core proceeding.  <u>Accord</u> <u>In re Toledo</u>,

170 F.3d at 1350 (finding a proceeding non-core that "sought to vindicate state-created

common-law rights but did not utilize any process specially established by the

Bankruptcy Code"); <u>In re Happy Hocker Pawn Shop, Inc.</u>, 212 Fed.Appx. 811 (11th Cir.

2006) (holding that each state law claim was a non-core proceeding in part because no

claim "invoke[d] a substantive right created by bankruptcy law" and each claim "could

arise outside of bankruptcy law"); <u>Lauer</u>, 288 B.R. at 276-77 (finding the debtor's state

law claim for money damages and for an injunction non-core proceedings because each

was not "[a] matter[] concerning the administration of the estate" or a "proceeding[]

affecting . . . the adjustment of the debtor-creditor . . . relationship" under Section 157(b)(2)).

Article III confirms that each claim of the Partnership is a non-core proceeding, an affinity – however strong[3] – between a claim and a category of Section 157(b)(2) notwithstanding.  If the Partnership's purely state law claims, asserted in state court, qualify as a core proceeding, "virtually any claim would entitle a bankruptcy court to enter final judgment," and "[Section] 157 would ignore the constitutional proscription limiting the jurisdiction of bankruptcy courts as set forth by the Supreme Court in Northern Pipeline."  Lauer, 288 B.R. at 276 (quotation omitted).  Because each claim is a non-core proceeding, the bankruptcy court's findings of fact and conclusions of law receive de novo review.

### 2. The Governing Documents

Under the documents governing the Association and the Partnership, the Association bears ultimate responsibility to pay for repair and maintenance of the Colony's common elements.  The Declaration states, "the maintenance and operation of the common elements [of the Colony] shall be the responsibility of the Association as a common expense."  (Ex. 13 Art. 6.5)  The "common elements" includes "the condominium property not included in the units."  (Ex. 13 Art. 3.12)  Further, Article Six

_____

[3] The Supreme Court recently acknowledged, in a manner that fully supports the result in this appeal, the tension between the categories of core proceeding in Section 157(b) and the requirements of Article III.  Stern v. Marshall holds that the debtor's state law counter-claim for tortious interference is a core proceeding "under the plain text of Section 157(b)(2)(C)" (the same provision under which the Association asserts its counter-claims are core proceedings), but that Article III prohibits a bankruptcy court's entering final judgment on the counter-claim.  131 S.Ct. 2594 (2011) (Roberts, C.J.).  In short, "[t]he Bankruptcy Court . . . lacked the constitutional authority to enter a final judgment on a state law counterclaim that is not resolved in the process of ruling on a creditor's proof of claim."  131 S.Ct. at 2620.

requires the Association to "maintain, repair and replace at the Association's expense: . . . [a]ll portions of a Unit, except interior surfaces, contributing to the support of the Unit . . . ."  (Ex. 13 Art. 6.2)  Article Three of the Declaration delegates other "common expenses" to the Association in detail:

> 3.13  *Common Expenses.*  The common expenses include:
>
> > (a) Expenses of administration; expenses of maintenance, operation, repair or replacement of the common elements, and of the portions, if any, of Units to be maintained by the Association, including but not limited to:
> >
> > > (i) Fire and other casualty and liability insurance . . . .
> > > . . . .
> > > (iii) Costs of water, operation and maintenance of sewage facilities, electricity and other utilities which are not metered to the individual Condominium Units.
> > >
> > > (iv) Labor, materials and supplies used in conjunction with the common elements.
> > > . . . .
> > > (vi) Damages to the Condominium property in excess of insurance coverage.
> > >
> > > (vii) Salary of a resident manager, his assistants and agents, and expenses only incurred in the management of the Condominium property.
> > >
> > > (viii) All other costs and expenses that may be duly incurred by the Association through its Board of Directors from time to time in operating, protecting, managing and conserving the Condominium property and in carrying out its duties and responsibilities as provided by the Condominium Act, this Declaration, the Articles of Incorporation or the Bylaws of the Association.
> >
> > . . . .
> > (c) Expenses declared common expenses by provisions of this Declaration or the Bylaws.
> >
> > (d) Any valid charge against the Condominium as a whole.

(Ex. 13 Art. 3.13) (emphasis in original); see also (Ex. 13 Art. 9.2, 9.4) (declaring insurance premiums a common expense of the Association); (Ex. 13 Art. 10.3, 10.5) (declaring payment for repair after casualty the responsibility of the unit owners and the Association).   The Declaration empowers the Association, pursuant to Florida's Condominium Act and the By-Laws of the Association, to assess a unit owner "for common expenses" and to impose a lien for a unit owner's unpaid assessment.  (Ex. 13 Art. 7.1, 7.4)

Erroneously interpreting Article 7.2, the bankruptcy court concluded that "[Article] 7.2 of the Declaration relieves Unit Owners who have made their units available to the Partnership [for use by the hotel] from paying assessments."  (Doc. 1-5 at 6) This formulation startles because Article 7.2 plainly relieves a unit owner from assessment "only to the extent that the Partnership makes such payments and assumes all other responsibilities of a unit owner in that regard."[4]

The bankruptcy court quoted also Article 6.3(a), which requires a unit owner to maintain "portions of his Unit" that are not the responsibility of the Association. Article 6.3 states that a unit owner need not maintain the unit "so long as . . . the Partnership is maintaining and repairing such unit."  Article 6.3 is not germane both because the Partnership seeks money to repair only the common elements, which Article 6.3 does not address, and because Article 6.3, like Article 7.2, requires the unit owners to pay maintenance and repair not paid by the Partnership.

―――――――――――

[4] When ruling from the bench the bankruptcy judge stated that the "starting point of [the Partnership's] argument is rather appealing, [that the] Declaration of Condominium [] says that the Association is responsible for the maintenance, repair and replacement of the common elements."  Case No. 8:08-ap-567-KRM (Doc. 101 at 12)  The written order ignores the "only to the extent" clause without explaining the abrupt change from the statement at the hearing.

The Articles of Incorporation of the Association empower the Association to assess the unit owners for the financial responsibilities of the Association in the Declaration.  (Ex. 14 Art. 3.2)  The By-Laws of the Association require the Association Board to:

> adopt a budget for each calendar year that . . . include[s] the estimated funds required to defray the common expenses and to provide and maintain funds for . . . reserves [for maintenance that occurs "less frequently than annually," see Art. 6.1,] according to good accounting practices.

(Ex. 15 Art. 6.2)  The bankruptcy court noted that "[l]ike the Declaration and the Articles, the By[-]laws contain an express provision that Unit Owners who have made their units available to the Partnership are expressly relieved from paying assessments."  (Doc. 1-5 at 11)  Again the bankruptcy court erroneously failed to enforce the limiting clause that relieves the unit owners only "to the extent" that the Partnership pays.  (Ex. 15 Art. 6.5)

The Partnership Agreement grants the Partnership control of the hotel at the Colony and allows the Partnership to rent each unit eleven months a year.  (Ex. 22 Art. 7, Art. 10)  The bankruptcy court emphasized that the Partnership Agreement "makes clear that the Limited Partners are not subject to assessment and have no personal liability for the Partnership's debts."  (Doc. 1-5 at 12, 33); see (Ex. 22 Art 8.1)  However, only in the role of limited partner is a unit owner not subject to assessment. Each unit owner is both a limited partner and a member of the Association, (Ex. 22 Art. 6.1(d)), and the Association may assess a member.  The Partnership concurs that a unit owner is not responsible, either as a limited partner or as a member of the

Association, for retirement of the Partnership's debt.  In this action the Partnership seeks money, not for retirement of the Partnership's debt but for maintenance of the common elements of the Colony, a solemn, fundamental, and unalterable statutory duty of the Association and its members, the unit owners.

Ruling that the Association is not subject to the 1984 Agreement, the bankruptcy court nevertheless applied the 1984 Agreement in some instances, albeit inconsistently. Compare (Doc. 1-5 at 29) ("The Association's Governing Documents were not amended to incorporate the assessment mechanisms or any other terms or provisions of the 1984 Agreement") with (Doc. 1-5 at 36) (concluding that the 1984 Agreement requires a vote of the unit owners to assess for the cost of repair).  The Partnership correctly asserts that the 1984 Agreement alters only the process by which the Association pays for repair of the common elements but preserves the Association's obligation to pay for repair to the common elements.

The preamble of the 1984 Agreement states in part:

> WHEREAS, the Association is responsible for payment of certain obligations pertaining to [the Colony], including the establishment of reserves therefore, all of which are described in the Declaration . . . (hereinafter together the "Obligations") including, without limitation, [] expenditures for repairs, maintenance and insurance of the Common Areas as described in the Declaration [and] expenditures for capital improvements . . . .

Before the 1984 Agreement, the Partnership distributed money from the hotel's profitable operation to each unit owner in the unit owner's capacity as a limited partner and, in turn, the Partnership sought money for repair of the common elements from each unit owner in the unit owner's capacity as a member of the Association.  The 1984

- 12 -

Agreement – and a "Tenth Amendment," which merely implements the 1984 Agreement in the Partnership Agreement – removes the unnecessary payment from the Partnership to the Association of money that the Partnership will reclaim to satisfy the Association's obligation to pay for common element repair.  (Trial transcript ("Tr.") 5/26/09 at 57-58).  The parties agree that the 1984 Agreement relieves the Association from paying for repair of the common elements at least "to the extent cash is available to the Partnership" for the repair.  (Ex. 27 ¶ 2); see also (Ex. 27, preamble).  However, the bankruptcy court erroneously (and inexplicably) declared that, with the 1984 Agreement and the Tenth Amendment, "[t]he Partnership became directly responsible for payment of all . . . expenses relating to the common elements."  (Doc. 1-5 at 32) The Association and the bankruptcy judge overlook the conspicuous and inescapable "solely to the extent cash is available" qualification that dramatically controls the meaning of the 1984 Agreement.  Because of the qualification, the Partnership is free to pay for repair of the common elements solely with money otherwise payable to the unit owners in their capacity as limited partners.  The 1984 Agreement and Tenth Amendment transfer initial, but not final, responsibility to the Partnership for such expenses.

The bankruptcy court erroneously concluded that the 1984 Agreement defines "obligations" "broadly . . . to include everything . . . that the Partnership would have had to pay in order to operate and maintain the Hotel."  (Doc. 1-5 at 14)  On the contrary, nothing in the 1984 Agreement extends "obligations" beyond the Declaration's definition of the Association's common expenses.  Compare  (Ex. 13 Art. 6.2) and (Ex. 13 Art.

10.3, 10.5) (Requiring the Association to pay for repair of the common elements and for casualty damage to the common elements) with (1984 Agree. ¶ 2) (defining the "obligations" of the Association to include paying for repair of the common elements and for casualty damage to the common elements).  Further, the 1984 Agreement repeatedly confirms that "the Obligations" are the responsibility of the Association (Ex. 27 preamble, ¶¶ 2, 5); the day-to-day operating expenses of the hotel, payable by the Partnership, are therefore not an "obligation" under the 1984 Agreement.  Yet the bankruptcy court stated that the 1984 Agreement allows the Association to determine whether to "fund cash flow shortfalls . . . that the Partnership [can]not pay."  (Doc. 1-5 at 17); see also (Doc. 1-5 at 41).  The bankruptcy court again conflated the hotel's operating cost (for which the Association bears no responsibility) and the common element repair cost (for which the Association bears full responsibility).

Paragraph two of the 1984 Agreement directs the Partnership to establish "such reserves as are deemed necessary and appropriate for the continued operation of the [Colony] as a first class resort hotel."  (Ex. 27 ¶ 2)  The bankruptcy court concluded that the 1984 Agreement and the Tenth Amendment require the Partnership to establish reserves for "necessary capital repairs," "replacement costs," and "the preservation of the Colony," and the bankruptcy court found that the Partnership's reserves "were woefully inadequate" and insufficient "to operate the Hotel as . . . a first class resort hotel."  (Doc. 1-5 at 18, 20)

The bankruptcy court erred by conflating reserves for repair of the common elements with reserves for operation of the hotel.  Because the hotel cannot operate

without the common elements of the Colony, the bankruptcy court assumed that the

Partnership must establish reserves sufficient to repair the common elements.

However, the 1984 Agreement states in the preamble that "the Association is

responsible for payment of certain obligations pertaining to the [Colony], including the

establishment of reserves[.  These obligations] are described in the Declaration . . . ."

(Ex. 27 preamble).  The By-Laws (which the Declaration requires the Association to

follow, see (Ex. 13 Art 8.1, 8.5)) direct the Association to establish reserves for deferred

maintenance and for "replacement required because of damage, depreciation or

obsolescence."  (Ex. 15 Art.6.1-2)  The accord established throughout the governing

documents assigns payment for operation of the hotel to the Partnership and assigns

payment for maintenance of the common elements of the Colony to the Association.

The 1984 Agreement upsets this scheme once only, in paragraph ten, which requires

the Partnership annually to pay forty-five thousand dollars into a "capital reserve

account" on behalf of the Association.[5]  (Ex. 27 ¶ 10).  The bankruptcy court

nevertheless concluded erroneously that paragraph two of the 1984 Agreement

implicitly shifts to the Partnership full responsibility to pay for repair of the common

elements.  Given the structure of the balance of the governing documents, paragraph

two, construed disinterestedly and reasonably, directs the Partnership to establish

reserves for the operation of the hotel.  Cf. (Tr. 5/26/09 at 97)  Requiring the Partnership

to establish the full reserves necessary to pay for repair of the common elements would

---

[5] The Partnership never paid a full forty-five thousand dollars into this capital reserve account, but only because, as testimony at trial and the minutes of Association Board meetings show, the Association voluntarily waived the establishment of additional reserves.  (Ex. 273 at 7-8; Ex. 279 at 1; Ex. 283 at 4; Tr. 5/26/09 at 92)

nullify paragraph ten, which requires the Partnership to pay only forty-five thousand dollars annually for common element maintenance.  The bankruptcy court's interpretation of the 1984 Agreement is therefore fundamentally flawed and untenable.

### 3. Other Bankruptcy Court Holdings

The Declaration manifestly commands that "maintenance and operation of the common elements . . . shall be the responsibility of the Association as a common expense."[6]  (Ex. 13 Art. 6.5)  Nothing presented to the bankruptcy court overcomes this plain and obvious mandate.

The bankruptcy court stated that "[t]he Declaration provides no specific or affirmative obligations and sets no standard that the Association must achieve in the maintenance and repair of The Colony."  (Doc. 1-5 at 31)  The standard, however, is explicit in the Declaration's mandate by operation of the plain language employed.  "Maintenance" is "the labor of keeping something (as buildings or equipment) in a state of repair or efficiency: care, upkeep," Webster's Third New International Dictionary ("Webster's"), 1362 (1976), and "upkeep" is "the act of maintaining in good condition."  Webster's at 2517.  Additionally, the Declaration requires the Association to pay for "repair" and "replacement" of the common elements. (Ex. 13 Art. 3.13(a))  To "repair" is to "restor[e] to a state of soundness."  Webster's at 1923.  To "replace" is to "place again: restore to a former place, position, or condition" or to "supply an equivalent for."  Webster's at 1925.  The Partnership argues – persuasively, given the ordinary and plain

---

[6] The declaration of a condominium "is the condominium's 'constitution.'" 5 Boyer, Florida Real Estate Transactions § 190.10[1] (2010).  "An association's authority is derived from the declaration and the bylaws provided the bylaws are not inconsistent with the declaration."  Boyer, supra, § 190.10[1].  "[The] declaration . . . is more than a simple contract spelling out mutual rights and obligations of the parties to it.  It assumes some of the attributes of a covenant running with the land."  Boyer, supra, § 190.10[1].

meaning of "maintain," "replace," and "repair" – that the Declaration obligates the Association to keep the common elements in a condition similar to the condition of the Colony in 1973.  Certainly, this standard leaves some opportunity for reasoned disagreement.  For example, some materials used in 1973 are no longer sold, which leaves the parties to debate what current product best approaches "replacement."  New government regulations prohibit certain rebuilding (Tr. 5/27/09 at 40-45, 79), which prohibition leaves the parties to debate whether a required change in the structure of a building qualifies as a "replacement" (or as near a replacement as reasonably feasible).  In any event, an adequate standard exists by which to ensure that the Association maintains the Colony.  If intractable dispute occurs, the parties may repair to the state court for a speedy determination of what is reasonable (thereby conforming with Florida's condominium laws and avoiding the disastrous implosion of an attractive, established, beachfront development).

The bankruptcy court suggested that the 1984 Agreement and the Tenth Amendment grant the Partnership so much control over the budget of the Association that the Association was relieved from paying for repair of the common elements. (Doc. 1-5 at 14-15)  How an increase in the Partnership's control over the Association's budget nullifies the unambiguous language of the Declaration ("maintenance and operation of the common elements . . . shall be the responsibility of the Association"), the bankruptcy court does not cogently explain.  In practice, the Association remained involved with, and informed about, the budget.  The minutes of the Association Board

meetings in the record show that the Board approved each proposed budget.  (Ex. 279 at 2; Ex. 282 at 1; Ex. 285 at 1; Ex. 289 at 1)

Noting that an "emergency" assessment requires unit owner approval (Ex. 15 Art. 6.6) and that the 2005 and 2006 proposed assessments were an "emergency" assessment, the bankruptcy court concluded that "the Partnership [cannot] force the Association to make an assessment [that] the Unit Owners twice voted [] down." (Doc. 1-5 at 35)  This formulation is oversimple and erroneous.  The 2005 and 2006 proposed assessments required the Association to pay for alteration of the common elements and were an "emergency" assessment.  The Partnership concurs that an emergency assessment requires a vote of the unit owners. <u>See</u> (Ex. 13 Art. 6.6) (requiring unit owner approval of "alteration" or "improvement" of the common elements).  The Partnership correctly submits, on the other hand, that the rejected 2005 and 2006 proposed assessments differ from the assessment the Partnership seeks in this action.  The assessment the Partnership seeks would address only the cost of maintenance and repair of the common elements.  The Association could have implemented the assessment without an "emergency" assessment.  Nothing in the Declaration or By-Laws impedes the Association's including the cost of repair to the common elements in an annual assessment.[7]

The bankruptcy court concluded erroneously that the Association cannot assess the unit owners even for repair of the common elements unless a majority of the unit

---

[7] Again, resort to Florida's mature and persuasive statutory arrangement benefits everyone. Section 718.112, Florida Statutes, mandates the contents of the by-laws of every condominium association in Florida.  Section 718.112(2)(e)(2.a) requires that the by-laws empower the unit owners to vote down an annual assessment that exceeds 115% of the assessment for the preceding year.  However, Section 718.112(2)(e)(2.b) explicitly excludes from the percent-increase calculation "reasonable reserves for repair or replacement of the condominium property [and] anticipated expenses of the association which the board does not expect to be incurred on a regular or annual basis."

owners vote to approve the assessment.  The bankruptcy court's conclusion is utterly

foreign to Florida's statutory regime, which is calculated to ensure the maintenance and

repair of the common elements enjoyed by each of Florida's 1.3 million condominium

residents.  The bankruptcy court reasoned that the 1984 Agreement, which provides

that the Association shall pay for "major capital improvements" through "special

assessment" (Ex. 27 ¶ 2), "distinguishes between an assessment needed to make

capital repairs and improvements and an assessment to fund the Association's annual

budget.  By this distinction," the bankruptcy court continued, "it is manifest that an

assessment for repairs . . . must be put to a vote of the Unit Owners."  (Doc. 1-5 at 36)

This conclusion is wholly erroneous and unsupportable.  No mention of "special"

assessment occurs in the Declaration or By-Laws.  The bankruptcy court asserted that

Section 718.103, Florida Statutes, requires that a "special" assessment "be

accompanied by a notice which sets forth the specific purpose or purposes of [the]

special assessment."  (Doc. 1-5 at 36) (quotation omitted).  Manifestly, a notice

requirement is not a vote requirement.  In fact, condominium boards often pay for

maintenance and repair by passing a "special" assessment without a unit owner vote.

See, e.g., George v. Beach Club Villas Condo. Assoc., 833 So.2d 816 (Fla. 3d DCA

2002); Farrington v. Casa Solana Condo. Ass'n, Inc., 517 So. 2d 70 (Fla. 3d DCA

1987); Cottrell v. Thornton, 449 So.2d 1291 (Fla. 2d DCA 1984).[8]

---

[8] Cottrell includes an especially informative passage:

We are often faced with appeals which are similar in nature to this appeal.  One area of
misunderstanding seems to derive from the fact that a necessary repair . . . may involve a
major expenditure of funds.  The fact that a major expenditure is involved in making a
substantial, necessary repair does not convert the repair into a material or substantial
addition or alteration . . , which would trigger a required vote of the unit owners.  That is
not to say, however, that condominium owners are not without a solution to this frequent

(continued...)

Even were a vote required, the bankruptcy court failed to explain on what ground the unit owners may casually "vote away" the obligation of the Association to pay for repairs to the common elements.  The governing statute, the governing documents, and common sense reject this notion.  In fact, "Maintenance and operation of the common elements . . . shall be the responsibility of the Association as a common expense."  (Ex. 13 Art. 6.5)  With a sufficiently large super-majority the unit owners may amend the Declaration (Ex. 13 Art. 15.3), but a simple majority of the unit owners may not vote in effect to nullify the Declaration.  In all instances, the declaration must conform to Florida's statutory requirement.

The bankruptcy court held that the Board's refusal to implement assessments for repairs without a vote was a proper exercise of the Board's business judgment.  In the words of the bankruptcy court, "the Board . . . determined in good faith that the Association would not benefit from assessing the members to rebuild The Colony," and "[t]he Partnership's attempts to supplant the Board's decision with that of this Court . . , or the Partnership's opinion of what is best for the Association[,] ignore the business judgement [sic] rule."  (Doc. 1-5 at 38, 40)

Without support in law or logic, the bankruptcy court imports and applies "the business judgment rule" to free the Association from the fundamental obligations

---

[8](...continued)
problem. We strongly urge that before conflicts arise that require resort to the courts, the owners should consider whether it is desirable to amend the condominium documents to place a restriction on the amounts that could be expended to make necessary repairs without a prior vote of the owners.

449 So.2d at 1292 (emphasis removed).  As in Cottrell, the governing documents of the Colony include no limit on the repair expenditures the Association Board may assess without a unit owner vote.

required by statute and memorialized in the Declaration.  But the business judgment rule is no license for a condominium association to break with impunity from an obligation that in the moment displeases the association.  If the Association can exploit the business judgment rule to escape paying for repair of the common elements, the Association may use the business judgment rule to escape honoring any purportedly binding document or contract, and each agreement the Association enters is entirely illusory because only in effect so long as the Association benefits.  This reasoning, like the conclusion that the unit owners may vote to rescind a binding obligation, is untenable.  Cf. Frank H. Easterbrook and Daniel R. Fischel, The Corporate Contract, 89 Colum. L. Rev. 1416, 1429 (Nov. 1989).

An erroneous assumption underlying the bankruptcy court's result is that the business judgment rule protects an Association's board not only from a member suit, but also from a third-party suit to enforce the lawful obligation of the Association to a third-party.  The bankruptcy court apparently believes that the business judgment rule empowers the Association to repudiate a contract or other obligation merely because the Association in the moment concludes that the contract does not favor the Association.  The business judgment rule has no such meaning and no such effect.  Of course, a board member must use business judgment to further the interests of the association, and the business judgment rule (as the rule applies to a condominium association) "protects the [a]ssociation's decisions so long as the [a]ssociation acts in a reasonable manner."  Garcia v. Crescent Plaza Condo. Ass'n, Inc., 813 So.2d 975, 978 (Fla. 2d DCA 2002) (citing Farrington v. Casa Solana Condo. Ass'n, Inc., 517 So.2d 70,

72 (Fla. 3d DCA 1987)).  But the business judgment rule is not a weapon permitting the Association to renege on statutory, contractual, and other obligations on a whim (or even after solemn deliberation).  The business judgment rule applies to a corporate governance dispute instigated by a member and protects an individual board member from personal liability.  The business judgment rule does not empower a corporation to escape the consequences of the corporation's actions toward the outside world.  If the Association Board flouts the statutes, violates the Declaration, lets the Colony crumble, and drives the Partnership to ruin, the Association as a whole may not escape the consequences merely because the Board intentionally inflicted the harm to further the perceived self-interest of the Association.

The bankruptcy court concluded that "the 1984 Agreement is ultra vires to the extent it may be interpreted to require the Association to assess the Unit Owners to fund operation shortfalls of the Partnership."  (Doc. 1-5 41-44)  As discussed earlier, see sec. 2, supra, the 1984 Agreement never obligates the Association to pay for the operation of the Partnership or the hotel.  The bankruptcy court noted that "[a] condominium association may exercise only those powers enumerated in the Condominium Act," (Doc. 1-5 at 43) (quoting Towerhouse Condo. v. Millman, 475 So. 2d 674, 676 (Fla. 1985)), but, as the bankruptcy court acknowledged, Florida's Condominium Act empowers the Association to maintain and repair the common elements.  Fla. Stat. § 718.111 (authorizing a condominium association to enter into contracts and collect assessments to maintain and repair common elements); see also sec. 4, infra.  Even if the 1984 Agreement were ultra vires as applied to the

Association and even if the Partnership must follow the 1984 Agreement but the Association need not, the Association's obligation under the Declaration to pay for the repair of the common elements remains.  See sec. 2, supra.

An undercurrent in the bankruptcy court's decision is that putative mismanagement by the Partnership excuses the Association's ignoring the obligation to pay for repair of the common elements.  However, the bankruptcy court vaguely but unmistakably attributes to the Partnership impropriety, but explicitly declines to adjudge the existence or effect of the supposed impropriety:

> [this Court makes no] finding of impropriety or malfeasance in the operations of the Partnership.  However , . . it is important to the analysis of this case that [] accounting issues and questions were discovered by the Association at a time when the Partnership was saying it did not have money and was requesting that assessments be made . . . .

(Doc. 1-5 at 22)  In the ruling from the bench, the bankruptcy judge stated:

> some, if not all [the alleged accounting improprieties] were disclosed and rectified . . . . But the fact that they occurred at all I think is enough to justify what the Association did [i.e., refuse to pay for repairs in 2007].

8:08-ap-567-KRM, (Doc. 101 at 19-20).  Without finding that the Partnership violated the governing documents, the bankruptcy court admonishes the Partnership.  The bankruptcy court finds that the Partnership deserves no redress even if the Association violated the governing documents.  The bankruptcy court left the allegations to linger as a spectral yet perceptible suggestion that the Partnership is in a general sense an unworthy claimant.

If the bankruptcy court believed that the Partnership's accounting or other practices relieved the Association of the obligation to honor the governing documents, the bankruptcy court needed to say so explicitly and attempt to explain why.  The bankruptcy court certainly presented no reason that an accounting impropriety, if

- 23 -

proven, justifies entirely dissolving the Association's obligation to pay for repair of the

common elements.  Even if the Partnership's accounting or operation of the hotel

harmed the Association, the proper course is not wholesale annulment of the governing

documents but rather an orderly claim under the applicable law of Florida, including

especially Chapter 718.

Another assumption floating ominously yet indeterminately in the background of

the bankruptcy court's decision is that the Association deserves release from the

obligation to pay for repairs because the governing documents are unfair.  The

bankruptcy court noted that the general partner prepared the Association's budget, that

"[t]he larger the amount of expenses that the General Partner allocated to the

Association's 'Obligations,' the greater the amount of distribution the General Partner []

receive[d]" (Doc. 1-5 at 15-16), and that the general partner received a distribution even

when the Partnership sustained a loss.  (Doc. 1-5 at 21)  The bankruptcy court

mentioned also that "[t]he Preferential Amount was set in 1973, but there [i]s no formula

for any change [to that amount] over time."  (Doc. 1-5 at 16)

The portrayal of the unit owners as trapped in an onerous agreement is

unfounded.  The Partnership estimates that the average rent value of a unit owner's

yearly, thirty-day use of a unit was $12,750.  (Ex. 38)  The interior of a unit was

maintained by the Partnership with hotel revenue (revenue generated, of course,

entirely through the efforts of the Partnership), and unrebutted evidence shows that

between 1987 and 2008 the Partnership contributed over $27 million of hotel revenue

toward repair of the common elements and nearly $5 million toward the real estate

taxes of the units.  (Ex. 38)  Overall, from 1987 to 2008 the unit owners received $33.76

million in distributions.  Over the same period, the general partner received

$4.59 million.  (Ex. 38)  For decades, a unit owner effectively received a free thirty-day

stay at a beachfront condominium each year plus the appreciation in value of the initial

investment in the Colony.  See (Ex. 153) and (Tr. 5/26/09 at 118-23) (estimating the

average appreciation in value of a unit as of 2006).  About this component of the

arrangement – the value of the Colony to the unit owners throughout past decades – the

bankruptcy court said not a word.

Given the historical value figures and the fact that the revenue for maintaining the

Colony for decades came entirely from the effort of the Partnership, where is the

unfairness?  To the extent the Partnership exercised control over the Association's

budget, until 2005 the Partnership exercised control over money generated by the

Partnership, and the Association Board approved the budget the Partnership proposed.

(Tr. 5/21/09 at 67, Tr. 5/29/06 at 110)  Although the general partner indeed received a

larger distribution if the cost of maintenance of the common elements rose above the

preferential amount, the general partner was authorized to pay only for repair or

restoration of the common elements and was therefore unable to deliberately generate

excessive maintenance costs.  The Partnership could not spend money on an

improvement or alteration of the common elements and unilaterally charge the cost to

the Association; an improvement or alteration required unit owner approval.[9]  Although

_____

[9] To repeat, if the Partnership attempted to charge the Association for an improvement to the common elements or for a hotel operating expense, the Association's recourse is to prove damages.  The Association failed to prove any damages before the bankruptcy court.  (Doc. 1-5 at 4 n.1) ("the [Association] did not present any evidence as to any damages it suffered").

the general partner received distributions after the hotel began to lose money, those distributions were matched dollar-for-dollar (on top of the $1.398 million preferential amount) with distributions that paid the obligation of the unit owners; the unit owners therefore continued each year to enjoy thirty days use of a unit at the Colony (plus the appertinent benefits) for dramatically less than cost.  For example, when the hotel operated at a loss in 2006 and 2007, the general partner managed the hotel and received a few hundred thousand dollars while each unit owner contributed nothing and received heavily subsidized use of a beachfront condominium and the associated amenities.

The bankruptcy court is correct that the Colony's governing documents "must be strictly construed to assure those investing in [the] condominium property that 'what the buyer sees the buyer gets.'"  (Doc. 1-5 at 29) (quoting Sterling Village Condo., Inc. v. Breitenbach, 251 So.2d 685, 688 (Fla. 4th DCA 1971)).  The distributions to the general partner were in accord with the governing documents (this, too, is "fairness").  That the preferential amount is constant over time is in accord with the governing documents.  Someone interested in becoming a unit owner in the Colony enjoyed full disclosure – guaranteed by Florida's condominium laws – of the governing documents.  A buyer saw exactly what a buyer would get.

Above all, a buyer could see that "maintenance and operation of the common elements . . . shall be the responsibility of the Association as a common expense."  (Ex. 13 Art. 6.5)

4. Florida Law

The plain language of the Declaration and the other governing documents resolves this appeal, but, more fundamentally, the Condominium Act, Chapter 718, Florida Statutes, resolves this appeal.  Florida law intricately and pervasively regulates the creation, form, operation, and governance (and, when necessary, the dissolution) of the condominium form of ownership, including the condominium unit owners' association.  The parties' dispute is entirely familiar to this statutory scheme (and entirely alien to bankruptcy law).

"The Condominium Act expressly provides that the Association is responsible for the maintenance and repair of the common elements."  5 Boyer, Florida Real Estate Transactions, § 190.20[2][c] (2010); see Fla. Stat. § 718.113(1).  Under the Condominium Act, an association board has both the authority and the duty to maintain the common elements.  See Ralph v. Envoy Point Condo. Ass'n, Inc., 455 So.2d 454, 455 (Fla. 2d DCA 1984); Boyer, supra, § 190.11[6].  In fulfilling the duty to maintain the common elements, the board may assess the members for common expenses without a vote of the unit members.  Section 718.115(1)(a), Florida Statutes, states that, "Common expenses include the expenses of the operation, maintenance, repair, replacement, or protection of the common elements and association property."  Section 718.115(2) states that, "Except as otherwise provided in [the Condominium Act], funds for payment of the common expenses . . . shall be collected by assessments against the units."  Boyer adds that:

> Unless provided otherwise in the condominium documents, a vote of
> unit owners generally is not required to levy a special assessment for

> condominium repair work, where the work is not a material alteration of
> the condominium property . . . .

Boyer, supra, § 190.44[2]; see also Cottrell v. Thornton, 449 So.2d 1291 (Fla. 2d DCA

1984).  A board may assess the members even for an alteration if the alteration is also

a necessary repair to the common elements.  "Simply because necessary work for

maintenance may also constitute alterations or improvements does not nullify a

condominium board's authority and duty to maintain the condominium common

elements."  Ralph, 455 So.2d at 455 (holding that an association board could assess

the members, without a member vote, to pay for a vertical sea-wall to protect the

common elements from storm damage because "if work was necessary, board authority

was sufficient").

"A condominium association may be liable for damages that result from negligent

maintenance of the common elements."  Boyer, supra, § 190.20[2][e]; see, e.g.,

Coronado Condo. Ass'n v. Scher, 533 So.2d 295 (Fla. 3d DCA 1988) ("[the] unit

owners . . . sued the . . . association for negligent maintenance of a sanitary sewer in

the common elements [and] won an order requiring the association to conform with its

duties under the Condominium Act").  In other words, the Condominium Act requires the

association to prevent deterioration of the common elements.  Rather than allow the

common elements to deteriorate, the Condominium Act states:

> In circumstances that may create economic waste, areas of disrepair, or
> obsolescence of a condominium property for its intended use and thereby
> lower property tax values, the Legislature . . . finds that it is the public policy
> of this state . . . to preserve the value of the property interests and the
> rights of alienation thereof that owners have in the condominium
> property . . . .

Fla Stat. § 718.117(1).  The method to preserve the value of the condominium is "termination [of the condominium] because of economic waste or impossibility."  Fla. Stat. § 718.117(2).  Termination, however, requires the approval of a super-majority of the members.  Fla. Stat. § 718.117(2); (Ex. 13 Art. 16).  In this action, rather than comply with the statutory command to "terminate" in the statutorily prescribed manner, the Association stopped paying for maintenance of the common elements.

The Condominium Act plainly states not only that an association must maintain the common elements but states also that "[t]he liability for assessments may not be avoided by waiver of the use or enjoyment of any common elements or by abandonment of the unit for which the assessments are made."  Fla. Stat. § 718.116(2).  In this action, a majority of the members effectively attempted to avoid liability for assessment by waiving en masse the "enjoyment of any common elements" (which eventually deteriorated beyond use).  This attempt violated en masse Section 718.116(2).

Further, by allowing the Colony to deteriorate, the Board and the majority of the members impermissibly altered the common elements to the detriment of a minority of the members.  (Ex. 13 Art. 15.3); cf. Boyer, supra, § 190[7][e][iii].  The Condominium Act requires that "no material alteration . . . to the common elements [occur] except in a manner provided in the declaration . . . ."  Fla. Stat. § 718.113(2)(a).  "The purpose of [this] provision[ is] to protect the [unit] purchaser against unanticipated changes in the common elements which could dramatically affect the cost and enjoyment associated with owning a condominium."  Wellington Prop. Mgmt. v. Parc Corniche Condo. Ass'n, Inc., 755 So.2d 824, 826 (Fla. 5th DCA 2000).  Deterioration of the common elements is

an "alteration" and a "change" against which the Condominium Act protects the members who favor repairing the common elements.

In addition, Florida law requires an association to honor agreements with third-parties such as the Partnership.  "The law simply does not," for example, "allow an association to borrow money and then absolve itself from repayment through its declaration or by-laws." Carmelitas Holding Company v. Paradise Beach Resort St. Augustine, 675 So.2d 660, 661 (Fla. 5th DCA 1996); see Boyer, supra, § 190.20[2][c] (citing Carmelitas Holding Company).  Carmelitas Holding Company holds that a homeowners association:

> cannot assert that repayment of a debt is ultra vires in an attempt to invalidate what was otherwise a permissible corporate action – borrowing money . . . to meet the expenses of operating the association and maintaining the association's property.

675 So.2d at 661.  Similarly, the Association cannot escape the obligation to maintain the common elements for use by the Partnership by declaring the obligation ultra vires.

In sum, each matter the bankruptcy court found important was a mischievous distraction because Florida law requires the Association to pay for maintenance of the common elements.

## 5. Damages and Mootness

The bankruptcy court rejected the Partnership's claim for damages on many grounds, each of which is flawed.  Several of the reasons for rejecting damages rely on the bankruptcy court's faulty interpretation of the 1984 Agreement and the Tenth Amendment.  Under a proper reading of the governing documents, the Partnership's pre-petition and post-petition damages arise from the Association's failure to pay for

repair and maintenance of the common elements.  The pre-petition damages arise directly from the Association's refusal to pay the obligations before the Partnership sued the Association.  The Partnership's expert, Dr. Henry Fishkind, demonstrated the post-petition damages with a conventional damages calculation, which shows that if the Association had repaired the common elements promptly, the revenue of the hotel (and thus the Partnership) would have dramatically recovered from the late-2000's decline. See (Ex. 121)

Although the bankruptcy court ruled that the Association is not responsible for damages because the Colony had needed repair for years and the Partnership under-reported the cost of the needed repair (Doc. 1-5 at 45-46), the Colony's needing repair long before the Partnership demanded repair excuses the Association from nothing. The bankruptcy court noted that the poor condition of the Colony impaired the hotel's profits "for at least the past fifteen years" (Doc. 1-5 at 45), but the Partnership seeks no damages for the decline in hotel revenue that occurred before the Partnership asked the Association to pay for repair.  (Ex. 121 at 10-11, 16-17)  The Partnership has no obligation promptly to alert the Association to each incipient need for repair.  In any case, no evidence shows that delaying repair increased the cost of repair.  If delay increased the cost, the Partnership bears no blame.  The Partnership must pay for the repair to the common elements only to the extent cash is available from hotel revenue to do so.  (Ex. 27 ¶ 2)  The statutory responsibility of the Association includes ensuring the common elements remain in good repair and establishing an adequate financial reserve for major and exigent repair.  (Ex. 13 Art. 6.5; Ex. 15 Art.6.1-2)  Nor is the "under-reporting" cited by the bankruptcy court a problem for the Partnership.  In 2005,

- 31 -

the Association hired an engineering firm to undertake a professional estimate of the cost of repair of the Colony.  Before the Association hired the firm, Katherine Moulton prepared a yearly estimate, which almost inevitably was an amount far less than the estimate of the professional firm.  The 1984 Agreement requires only that the Partnership each year prepare for the Association's review a budget that details the "obligations" paid by the Partnership.  Nothing in the governing documents entitles the Association to rely on a Partnership-produced estimate of needed repair or needed reserves for future repair.  Regardless, Moulton testified that she kept the Association Board's members aware that major repair to the common elements would cost more than the Association's reserves (Tr. 5/27/09 at 11-12), yet the Association Board and the Association consistently voted to waive reserves anyway.  E.g. (Ex. 273 at 7-8; Ex. 279 at 1; Ex. 283 at 4)  The Association Board knew both that Moulton's estimates were low and that the Colony, built in 1973, would eventually need extensive repair.

Finding that "the Hotel [at the Colony] operated at a loss for six of the last eight years," the bankruptcy court rejected the Partnership's damage claim in part because of the Partnership's losses.  (Doc. 1-5 at 46-47)  At an Association Board meeting in December, 2004, the Board discussed the common elements' dilapidated condition and decided to hire the engineering firm to assess the cost of repair.  (Ex. 51)  Annual hotel profit at the time of the meeting was over a half-million dollars.  (Ex. 38)  In a July, 2005, letter, the Partnership's attorney informed the Association's attorney of the urgent need for repair of the common elements.  (Ex. 149)  The letter concludes by asking the Board:

> as [the Board] is required to do under the various Colony documents,
> [to] commence the process to preserve and protect the Colony by
> implementing . . .  the repairs that are necessary and the assessments
> associated therewith.

(Ex. 149)  The hotel's profit in 2005 was $360 thousand.  At that time, the hotel had

earned a profit in sixteen of the preceding nineteen years.  (Ex. 38)  In December, 2006,

when the Partnership implored the Association Board to approve a budget including

several million dollars for repair of the common elements (Ex. 54), the hotel had begun

to lose money.  (Ex. 38)  Four of the six losing years the bankruptcy court cited occurred

after the Association first breached the Declaration by refusing to pay for repair of the

common elements, and the Partnership was profitable when the breach began.  The

bankruptcy court's rejection of damages due to "the Hotel's history of being unprofitable"

was clear error.

The Partnership presented four damage scenarios, each of which the bankruptcy

court rejected because "[t]he occupancy rate and average daily rate that the Partnership

used to calculate damages [in each scenario] ha[s] never been attained."  (Doc. 1-5 at

46)  "Difficulty in proving damages or uncertainty as to amount," however, is not fatal to

a plaintiff's claim for recovery.  Forest's Mens Shop v. Schmidt, 536 So.2d 334, 336

(Fla. 4th DCA 1988).  Rather, a plaintiff need show a reasonable basis for computing an

approximate amount of damages.  Sampley Enterprises, Inc. v. Laurilla, 404 So.2d 841,

842 (Fla. 5th DCA 1981); Devon Medical, Inc. v. Ryvmed Medical, Inc., 60 So.3d 1125,

1128 (Fla. 4th DCA 2011).  The Partnership's expert reasoned that after renovation the

hotel would out-perform the average hotel occupancy rate in Sarasota because the

hotel, on the beach and renovated, would "be newer than [the] average [hotel] and []

would have a superior location to the average hotel."  (Tr. 5/22/09 at 29)  In this light, the expert's five percent increase in hotel occupancy above the market average (Ex. 121 at 6), was modest and reasonable.  The average daily rate the expert adopted, $280, was "attained" by the hotel in the past and is consistent with the hotel's performance before the Colony's facilities degraded.  (Tr. 5/22/09 at 30)  (Of course, a fact-finder might find $260 or $220 or another rent established by the facts; finding a fault in $280 fails to justify collapsing to zero rent or declaring the rent unknowable.)

The bankruptcy court concluded that "[t]he Partnership's damage model is based on a number of contingencies and assumptions," specifically that the Partnership, despite defaulting on a loan in 2006 (Ex. 177), could obtain the capital necessary to renovate the interior of each unit and that the Association could obtain a loan for the repair of the common elements.  (Doc. 1-5 at 48)  The Partnership tried, but failed, to show that a bank offered a loan to the Partnership for interior renovation contingent upon the Association paying for repair to the common elements.  See (Tr. 6/1/09 at 75-78)  However, if the Partnership failed to obtain a loan, the failure occurred as, and likely because, the Association failed to honor the obligation to pay for repairing the common elements.  Cf. Whitney v. Citibank, N.A., 782 F.2d 1106, 1118 (2d Cir 1986) ("When a difficulty faced in calculating damages is attributable to the defendant's misconduct, some uncertainty may be tolerated") (citing Bigelow v. RKO Radio Pictures, 317 U.S. 251, 264-65 (1946)).[10]  By the time the Partnership defaulted, the Association

---

[10] "[A] stricter standard of proof is necessary for [the] fact of damage than for [the] amount of damage."  Yoder Bros., Inc. v. California-Florida Plant Corp., 537 F.2d 1347, 1371 n.24 (5th Cir. 1976).  Failure to obtain a loan for interior renovation might reduce the Partnership's lost profits.  However, because of the superior location and past profitability of the Colony, the Partnership's regaining profitability after repair to the common elements alone is hard to doubt.  See (Ex. 121)

was already breaching the Declaration.  The Partnership was likely far more credit-worthy earlier, when the hotel was still profitable.  As for the assumption that the Association could obtain a loan, the bankruptcy court's faulting the Partnership for assuming the Association could pay for repair of the common elements is slightly bizarre.  A damage calculation estimates the plaintiff's position "but for" the defendant's wrongful conduct.  The damage calculation presented by the Partnership necessarily treats the Association's paying for repair of the common elements – whether by a loan or by assessment of the unit owners – as a benchmark.

Finally, the Partnership objects that the bankruptcy court erred in finding the Association's counter-claims moot.  However, the bankruptcy court added the condition that each counter-claim and third-party claim will receive reconsideration if any of the rulings in favor of the Association are reversed.  (Doc. 1-5 at 49 n.5)  The contemplated reversals occur, and the reconsideration must occur also.  The Partnership's objection to the finding of mootness is moot.

## CONCLUSION

The challenged orders of the bankruptcy court and each order of the bankruptcy court in this action that is inconsistent with this order are **REVERSED**.  The district court (1) **STAYS** this order pending further order of the district court, retains jurisdiction of the proceeding, and withholds the issuance of instructions to the bankruptcy court; (2) directs that the parties submit by **August 5, 2011**, a paper (one paper for each side and only one paper for both this appeal and the companion appeal in Case No. 8:10-cv-913-T-23) of seven or fewer pages that

discusses the precise form of the remedy that the respective party recommends as a consequence of the district court's reversal of the bankruptcy court, and (3) sets a hearing for **August 11, 2011, at 1:30 p.m.** to hear argument on the form of the remedy.  Counsel for each party shall appear at the hearing prepared and authorized to address the prospect of court-ordered mediation (including the issues of when, where, and by whom the mediation will be conducted)..

ORDERED in Tampa, Florida, on July 27, 2011.

**STEVEN D. MERRYDAY**
**UNITED STATES DISTRICT JUDGE**